UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

---

In the Matter of the Search re:

20-017-04

No. _4:20 mj-15_

**APPLICATION FOR SEARCH AND
SEIZURE WARRANT**

---

I, Adam C. Topping, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation (FBI), and have reason to believe that on the property or premises as fully described in Attachment A, attached hereto and incorporated herein by reference, there is now concealed certain property, namely: that which is fully described in Attachment B, attached hereto and incorporated herein by reference, which I believe is property constituting evidence of the commission of criminal offenses, contraband, the fruits of crime, or things otherwise criminally possessed, or property designed or intended for use or which is or has been used as the means of committing criminal offenses, concerning violations of 18 U.S.C. § 875(a).

The facts to support a finding of Probable Cause are contained in my Affidavit filed herewith.

_____
Adam C. Topping, Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence on the _14th_ day of February, 2020, at Sioux Falls, South Dakota.

_____
VERONICA L. DUFFY
United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

In the Matter of the Search Regarding   No. 4:20- mj - 15

20-017-04

**AFFIDAVIT IN SUPPORT OF
SEARCH AND SEIZURE WARRANT**

STATE OF SOUTH DAKOTA     )
                                                  :SS
COUNTY OF MINNEHAHA      )

I, Adam C. Topping, being first duly sworn upon oath, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the Sioux Falls, South Dakota, office and I am charged with investigating violations of federal statutes within the District of South Dakota. I have worked as a Special Agent with the FBI for more than 11 years. I have conducted a wide variety of investigations to include international and domestic terrorism, violent crimes, white collar crimes, and crimes in Indian country. The following information is based on investigation solely by the FBI. This Affidavit does not contain the entirety of my knowledge regarding this investigation.

2.      Through this affidavit, I am requesting that a search and seizure warrant be issued for a black, Alcatel brand, smartphone belonging to Kyle Gullikson, hereinafter referred to as Kyle's telephone. The telephone was located in Kyle's property at the Bureau of Indian Affairs (BIA) Correctional Facility in

Wagner, South Dakota following his arrest by Yankton Sioux Law Enforcement (YSLE) regarding a tribal matter. Kyle's property was turned over to me on February 7, 2020, following his arrest pursuant to a federal arrest warrant issued during this investigation involving Internet threatening communications to victim Keith Cournoyer.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 18 United States Code §§ 875(c), involving the communication in interstate commerce of a threat to injure the person of another, is present in the cellular telephone listed in paragraph 2.

4. I have worked with other law enforcement personnel regarding this investigation. The statements contained in this affidavit are based on information that has been provided to me directly or indirectly by witnesses and other law enforcement personnel. The information and conclusions expressed are also based upon my own experience and training as a law enforcement officer, and my personal involvement and knowledge gained during the course of this investigation.

5. This affidavit is submitted in support of an application for a search warrant, under Rule 41 of the Federal Rules of Criminal Procedure, authorizing the examination of property, in this case, a cellular telephone, more fully described in Attachment A, which is currently in the possession of the FBI, and

the extraction from that property of electronically stored information, more fully described in Attachment B.

6. I have probable cause to believe that evidence of violations of Title 18 United States Code § 875(c), involving communicating a threat to injure the person of another in interstate commerce, is located within Kyle's telephone. I have reason to believe that the telephone will have stored information and communications that are relevant to this investigation, to include evidence of Kyle's use of Facebook, which was the medium used to make the Internet threat. Thus, as outlined below, and based on my training and experience, there is probable cause to believe that evidence, fruits and/or instrumentalities of the aforementioned crime is located on the telephone.

**IDENTIFICATION OF DEVICE TO BE EXAMINED**

7. The device to be examined is a cellular telephone, more specifically identified as a black, Alcatel brand, smartphone currently in the possession of the FBI and which was located in Kyle Gullikson's property maintained by the BIA after he was arrested by YSLE pursuant to a tribal matter.

8. I believe there is probable cause that establishes that the device contains evidence, fruits, and instrumentalities of violations of Title 18 United States Code § 875(c), involving the communication in interstate commerce of a threat to injure the person of another. The applied-for warrant would authorize the forensic examination of the device for the purpose of identifying electronically stored data particularly described in Attachment B.

[3]

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

9.   Based on my training and experience, I know that a wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the

[4]

local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

10. Based on my knowledge, training, and experience, I know that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

11. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

[5]

12.    There is probable cause to believe that things that were once stored
on the Device(s) may still be stored there, for at least the following reasons:

a) Based on my knowledge, training, and experience, I know
that digital files or remnants of such files can be recovered
months or even years after they have been downloaded
onto a storage medium, deleted, or viewed via the Internet.
Electronic files downloaded to a storage medium can be
stored for years at little or no cost.  Even when files have
been deleted, they can be recovered months or years later
using forensic tools.  This is so because when a person
"deletes" a file on a digital storage device or computer, the
data contained in the file does not actually disappear;
rather, that data remains on the storage medium until it is
overwritten by new data.

b) Therefore, deleted files, or remnants of deleted files, may
reside in free space or slack space—that is, in space on the
storage medium that is not currently being used by an
active file—for long periods of time before they are
overwritten.  In addition, a computer's operating system
may also keep a record of deleted data in a "swap" or
"recovery" file.

c) Wholly apart from user-generated files, computer storage
media including digital storage devices and computers'
internal hard drives can contain electronic evidence of how
a computer has been used, what it has been used for, and
who has used it.

d) Similarly, files that have been viewed via the Internet are
sometimes automatically downloaded into a temporary
Internet directory or "cache."  Forensic review may also
disclose when and by whom the Internet was used to
conduct searches, view material, and communicate with
others via the Internet.

13.    Forensic evidence.  As further described in Attachment B, this
application seeks permission to locate not only electronically stored information
on the Device that might serve as direct evidence of the crimes described on the
warrant, but also forensic evidence that establishes how the Device was used,

the purpose of the use, who used the Device, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a) Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b) Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c) A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves.  Therefore, contextual information necessary to understand other

evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f) Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain internet cache folders that would be stored on the computer's hard drive and may contain deleted information within the unallocated space of the computer's hard drive.

g) Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

14.    I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is

performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

15.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device or information from a copy of the Device consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

16.    On November 4, 2019, Gavin Little was sentenced in United States District Court, District of South Dakota, Southern Division after being adjudicated guilty of 18 U.S.C. §§ 1201 and 2, kidnapping, which occurred on November 25, 2018, involving victim Keith Cournoyer.  Gavin was sentenced to 210 months of imprisonment in the custody of the United States Bureau of Prisons.  I was present during the sentencing hearing and witnessed many family members and friends of both Gavin Little and Keith Cournoyer in attendance. As part of the FBI investigation of Gavin Little, I am aware that the families of Gavin and Keith are related and that the sentencing of Gavin to imprisonment would create a dramatic increase in tension between family members.   The increase in tension was evidenced during the hearing by aggressive words spoken by members of both families, and in particular by Keith's aunt Jean Tiger who reported to me that a member of Gavin's family made a verbal threat to

[10]

shoot "her" upon their return to Wagner, South Dakota. The identity of "her" in that instance is unknown; however, it is assessed that the statement was made in light of the prosecution and sentencing of Gavin.

17.     On November 5, 2019, at 8:35 AM, I received two multimedia messages on my FBI issued cellular telephone from Keith Cournoyer. The messages contained screenshots of Keith's cellular telephone depicting his Facebook account and three messages sent from a Facebook account using screen name Kyle Gullikson. It was apparent that the same account with screen name Kyle Gullikson sent all three messages as the profile picture for each message was the same image. Two of the Facebook messages appeared to be publicly viewable comments made by Kyle, and the third appeared to be a private message sent by Kyle directly to Keith. The publicly viewable comments read, "Pussy, I will see you, your [sic] a great actor," and "This isn't over bitch." The private message read, "sup punk, your [sic] dead." Keith responded at 8:33 AM in a private message back to Kyle that read, "Yeah you guys obviously don't care about Kaylin." Kaylin is Keith's young daughter who is also related to Gavin's family.

18.     Shortly after I received the multimedia messages from Keith, I spoke with him via telephone to address his concerns. Keith stated that Kyle is Gavin's half-brother and that he considered the threat to be a serious matter. Keith was concerned for his safety and agreed to meet me in-person that morning at the FBI office in Sioux Falls, South Dakota.

[11]

19.    On November 5, 2019, I conducted an in-person interview of Keith Cournoyer.  Keith accessed his Facebook account on his cellular telephone and showed me the messages sent by Kyle Gullikson.  Keith gave his permission for me to take photographs of his telephone while the Facebook messages were displayed.  Keith stated that the comment which read, "This isn't over bitch," had since been deleted; however, the other comment and the private message were still present.  Time stamps on the Facebook messages indicated that Kyle had sent the publicly viewable comments in the 1:00 AM hour on November 5, 2019, and the private message at 1:19 AM the same day.  Keith stated that he considered the threat made by Kyle a serious matter, and he was sincerely concerned for his safety and for that of his family.  Keith expressed his concern that other members of Gavin's family could also attempt to exact revenge against him because they blamed him for Gavin's imprisonment.  Keith also stated his desire to relocate to Canada in attempt to distance himself and his family from the threat.  Regarding the familial relationship between Gavin and Kyle, Keith stated that they have the same father, Randy Little.

20.    On several occasions prior to November 5, 2019, Keith had expressed concerns for his safety.  On September 12, 2019, an email was sent by Traci Smith, the public defender for Minnehaha County, to Assistant United States Attorney (AUSA) Jeffrey Clapper.  Traci wrote that she had met with Keith regarding a non-case related citation he had received prior to him being assaulted in November, 2018.  During the meeting, Keith told Traci that he was concerned for his safety and that he felt like he was being threatened by people

involved in the federal case. On June 17, 2019, Keith's mother, Darla Cournoyer sent a text message to me on my FBI issued cellular telephone requesting information on victim/witness protection and relocation programs that might be available to Keith. Darla wrote that Keith was living in fear of "getting finished off" and wanted to relocate to Canada with his family.

21.   Open source research of Facebook on November 5, 2019, revealed Facebook account number 100023369144989 as being active, having corresponding screen name Kyle Gullikson, and having corresponding user name kyle.gullikson.39. The profile picture uploaded by the user of the account appeared to depict a Native American male fitting the known age of Kyle Gullikson. Publicly available information displayed in the account revealed the user attended Marty Indian High School, was from Marty, South Dakota, and lived in Marty, South Dakota. The user also noted his birthday on the account to be February 20, 1991, which is identical to that of Kyle Gullikson. Based on my knowledge and experience investigating crimes in Indian country, I know that Marty, South Dakota, is within the exterior boundaries of the Yankton Sioux Indian Reservation, and is the same reservation affiliated with Gavin Little and Keith Cournoyer.

22.   On November 7, 2019, a search warrant was served on Kyle Gullikson's Facebook account ordering the production of records related to this matter. On November 25, 2019, Facebook provided records which indicate that Kyle likely deleted the message to Keith, "sup punk, your [sic] dead," as the message is not evident in the records; however, Keith's response, "Yeah you guys

[13]

obviously don't care about Kaylin" is evident.  Kyle's public comment, "Pussy, I will see you, your [sic] a great actor," is evident; however, his other public comment, "This isn't over bitch," appears to have been deleted.

23.    On December 3, 2019, a search warrant was served on Keith Cournoyer's Facebook account ordering the production of records related to this matter.  On January 10, 2020, Facebook provided records which indicate that Kyle had made the comment, "Pussy, I will see you, your [sic] a great actor," and sent the message, "sup punk, your [sic] dead," to Keith in response to Keith posting a photograph of himself with the title, "Court went decent I'm just happy to still be alive for my kids!"

24.    Having evidence from Facebook that threatening messages had been sent using the Facebook account of Kyle Gullikson, probable cause exists that Kyle used his cellular telephone to access Facebook to post the messages.  On January 20, 2020, I interviewed Kyle's mother, Kellie Gullikson, and his sister, Emily Gullikson.  They stated that Kyle was actively still posting messages using his Facebook account and that they had personally seen those recent messages.  Neither Kellie, nor Emily had any reason to believe that anyone other than Kyle had ever used Kyle's Facebook account to post messages.  All of the content on Kyle's Facebook account were indicative of only Kyle using the account.  Additionally, in my review of Kyle's Facebook account obtained pursuant to the above referenced search warrant, I did not discover evidence that anyone other than Kyle had used his account.

25.   On November 13, 2019, I interviewed Kyle's mother, Kellie Gullikson.   Kellie stated that Kyle did not have a telephone number and only used Facebook to communicate.   In my experience investigating matters involving Indian country on the Yankton Sioux Indian Reservation, I have learned that the primary means of electronic communication for individuals residing there is through the use of Facebook and, to a lesser degree, other Internet social media accounts.   Additionally, I have learned through my experience that those individuals often do not own or have access to traditional desktop computers or laptops that could facilitate Internet access, rather those individuals almost exclusively use personally owned cellular smartphones.   For the reasons noted above, probable cause exists that Kyle Gullikson used his personally owned cellular telephone to access his Facebook account and send threatening messages to Keith Cournoyer.

## CONCLUSION

26.   Based on the above information, I believe that there is probable cause to believe that evidence relating to violations of Title 18 U.S.C. § 875(c), involving the communication in interstate commerce of a threat to injure the person of another, is present on Kyle Gullikson's telephone.

27.   I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

[15]

_____

Adam C. Topping, Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence on the ___14___<sup>th</sup> day of

February, 2020, at Sioux Falls, South Dakota.

_____

VERONICA L. DUFFY
United States Magistrate Judge

## ATTACHMENT A

## <u>DESCRIPTION OF PROPERTY TO BE SEARCHED</u>

1. A black, Alcatel brand, smartphone belonging to Kyle Gullikson which is currently possessed by the FBI and which was previously located in Kyle's property possessed by the Bureau of Indian Affairs (BIA) Correctional Facility in Wagner, South Dakota.
2. Photographs taken of the phone are provided here:

 

**ATTACHMENT B**

**DESCRIPTION OF INFORMATION TO BE SEIZED AND REVIEWED**

Pursuant to Rule 41(e)(2)(B), this warrant authorizes the seizure of electronic storage media and the copying of electronically stored information. The warrant authorizes a review of the media and information for all records, contained within the item described in Attachment A, and relating to violations of Title 18 U.S.C. § 875(c), involving the communication in interstate commerce of a threat to injure the person of another, those violations involving Kyle Gullikson and occurring on or after November 4, 2020, including:

1. All names, aliases, and telephone numbers stored in the phone, including any telephone number directory stored in the memory of the phone;

2. All telephone calls made or received that are stored in the memory of the phone;

3. All text messages sent or received, or made but not sent, that are stored in the memory of the phone;

4. The content of any and all voice mail messages;

5. All images. Photographs and videos, sent or received, that are stored in the memory of the phone;

6. Any and all records, showing dominion, ownership, custody or control over the phone;

7. Any and all Internet history or Internet links that are stored in the memory of the phone;

8. Any and all information relating to Facebook accounts and any Facebook communications, records, and data that are stored in the memory of the phone.

Before reviewing data from the electronic storage media or electronic stored information seized pursuant to this warrant for purposes unrelated to this investigation, the government agrees to request another search warrant from the court.

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

_____

In the Matter of the Search re:          No. 4:20-mj-15

20-017-04                                **SEARCH AND SEIZURE WARRANT**

_____

TO:   ANY AUTHORIZED LAW ENFORCEMENT OFFICER

An application by a federal law enforcement officer or an attorney for the government requests the search of the following property more fully described in Attachment A, attached hereto and incorporated herein by reference.

I find that the affidavit, or any recorded testimony, establish probable cause to search and seize the property described above, and that such search will reveal evidence of violation of 18 U.S.C. § 875(a), which is more fully described in Attachment B, attached hereto and incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before
_2-28-2020_____ (not to exceed 14 days)

☒ in the daytime – 6:00 a.m. to 10:00 p.m.

☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the undersigned Judge.

☐   Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized,

cc AUSA Clapper and Agent
jls

☐ for _____ days *(not to exceed 30).*

☐   until, the facts justifying, the later specific date of _____.

2-14-2020 at 11am CST at Sioux Falls, South Dakota
Date and Time Issued


VERONICA L. DUFFY
United States Magistrate Judge

[2]

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

1. A black, Alcatel brand, smartphone belonging to Kyle Gullikson which is currently possessed by the FBI and which was previously located in Kyle's property possessed by the Bureau of Indian Affairs (BIA) Correctional Facility in Wagner, South Dakota.
2. Photographs taken of the phone are provided here:

 

## ATTACHMENT B

### DESCRIPTION OF INFORMATION TO BE SEIZED AND REVIEWED

Pursuant to Rule 41(e)(2)(B), this warrant authorizes the seizure of electronic storage media and the copying of electronically stored information. The warrant authorizes a review of the media and information for all records, contained within the item described in Attachment A, and relating to violations of Title 18 U.S.C. § 875(c), involving the communication in interstate commerce of a threat to injure the person of another, those violations involving Kyle Gullikson and occurring on or after November 4, 2020, including:

1. All names, aliases, and telephone numbers stored in the phone, including any telephone number directory stored in the memory of the phone;

2. All telephone calls made or received that are stored in the memory of the phone;

3. All text messages sent or received, or made but not sent, that are stored in the memory of the phone;

4. The content of any and all voice mail messages;

5. All images. Photographs and videos, sent or received, that are stored in the memory of the phone;

6. Any and all records, showing dominion, ownership, custody or control over the phone;

7. Any and all Internet history or Internet links that are stored in the memory of the phone;

8. Any and all information relating to Facebook accounts and any Facebook communications, records, and data that are stored in the memory of the phone.

Before reviewing data from the electronic storage media or electronic stored information seized pursuant to this warrant for purposes unrelated to this investigation, the government agrees to request another search warrant from the court.